IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CRAIG P. ELLIS,

      Plaintiff,

v.                                                                                 No. 11-cv-0379 WJ/SMV

BERNALILLO COUNTY METROPOLITAN
DETENTION CENTER et al.,

      Defendants,

*and*

CRAIG P. ELLIS,

      Plaintiff,

v.                                                                                 No. 11-cv-0582 WJ/SMV

RAMON RUSTIN et al.,

      Defendants.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

### Introduction

THIS MATTER is before the Court on Plaintiff Craig P. Ellis' Prisoner Civil Rights Complaint [Doc. 1][1] ("Complaint"), filed herein on May 4, 2011, and Defendants William Shannon, M.D., Timothy McMurray, M.D., and Timothy Trapp, M.D.'s *Martinez* Report [Doc. 73], filed herein on November 19, 2012.  Defendants requested that the Court treat their *Martinez* Report as a motion for summary judgment pursuant to *Hall v. Bellmon*, 935 F.2d 1106,

---

[1] Unless otherwise noted, all references to the record will be to Cause No. 11-cv-0379 WJ/SMV.

1109–13 (10th Cir. 1991) (a court may use the *Martinez* report to grant summary judgment). ON March 19, 2012, the Honorable William P. Johnson, United States District Judge, referred this matter to me to recommend an ultimate disposition of the case.  Order of Reference . . . [Doc. 44].  Having reviewed the record, the pleadings and the relevant law, and being otherwise fully advised in the premises, I will RECOMMEND that the *Martinez* Report be treated as a motion for summary judgment, that the motion be GRANTED, and that all claims raised against the remaining Defendants be DISMISSED WITH PREJUDICE.

## **Procedural Background**

On May 4, 2011, Plaintiff filed a Prisoner's Civil Rights Complaint pursuant to 42 U.S.C § 1983 alleging that he suffered serious injuries to his knee and hand while incarcerated at the Bernalillo County Metropolitan Detention Center ("BCMDC").  *See* [Doc. 1] at 2.  On May 6, 2011, he filed a tort action in the Second Judicial District, County of Bernalillo, State of New Mexico, seeking damages arising from the same incidents that form the basis for his § 1983 claim.  *See* Complaint to Recover Damages for Injury [Doc. 1-2] at 2 (filed in Cause No. 11-cv-0582 WJ/SMV).  The Defendants removed the state tort action to federal court on June 30, 2011.  Notice of Removal [Doc. 1] (filed in Cause No. 11-cv-0582 WJ/SMV).  On July 27, 2011, Judge Johnson issued an order consolidating the two cases.  Order of Consolidation [Doc. 9] (filed in Cause No. 11-cv-0582 WJ/SMV).  The civil rights case, Cause No. 11-cv-0379 WJ/SMV, was designated as the lead case.  *Id*. at 1.  The parties were instructed to make all filings in both actions under Cause No. 11-cv-0379 WJ/SMV.  *Id.* at 2.

On January 24, 2012, Judge Johnson issued an order, sua sponte, dismissing Plaintiff's claims against Defendants BCMDC, Torrez, BCMDC's Contracted Health Services, Rustin,

Contract Medical Services, and Bakewell.  Memorandum Opinion and Order [Doc. 33] at 4. Thus, the only remaining Defendants are Drs. Shannon, Trapp and McMurray.  All three have filed Answers to the Complaint.  *See* Answer to Prisoner's Civil Rights Complaint [Doc. 45]; Defendant William Shannon, M.D.'s Answer to Prisoner's Civil Rights Complaint [Doc. 61].

On August 24, 2012, I ordered Defendants to submit *Martinez* Reports. Order Directing Submission of *Martinez* Reports [Doc. 72]. The Order gave notice that the *Martinez* Reports might be used in deciding whether to grant summary judgment on Plaintiff's claims. *Id*. at 5. Defendants filed their Joint *Martinez* Report on November 19, 2012. [Doc. 73].  Defendants requested that the *Martinez* Report be considered a motion for summary judgment, and that all claims raised against them be dismissed with prejudice. *Id*. at 2. Plaintiff did not file a response to the *Martinez* Report. *See* [Doc. 72] at 5 (directing Plaintiff to file his response, if any, within 30 days of the filing of the *Martinez* Report). In reaching my recommended disposition, I have considered all of the briefing, including Plaintiff's Complaint and exhibits, and Defendants' *Martinez* Report, along with all the exhibits attached thereto, including Plaintiff's medical records.

## Analysis

### I.   Summary Judgment Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting an entitlement to summary judgment must support its assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions,

interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). A court may grant summary judgment in favor of the movant if the material facts are undisputed and show that the movant is entitled to judgment. Fed. R. Civ. P. 56(e)(2) and (3).

The party moving for summary judgment has the initial burden of establishing that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is met, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n.11 (10th Cir. 1992). Although all facts are construed in favor of the non-moving party, it is still plaintiff's responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted). Despite being pro se, a pro se non-moving party must "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks omitted). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion. *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1180 (10th Cir. 2013).

In a suit brought by a pro se prisoner, a court may order the defendants to investigate the plaintiff's claims and submit a report of that investigation, called a *Martinez* Report. *See Hall*, 935 F.2d at 1109; *Martinez v. Aaron*, 570 F.2d 317, 319–20 (10th Cir. 1978). A court may use the *Martinez* Report to grant summary judgment upon motion of the defendants. *Hall*, 935 F.2d

at 1009–13; *see also Celotex*, 477 U.S. at 326 (courts possess the authority to enter summary judgment *sua sponte*, so long as the losing party is on notice that she must come forward with all her evidence).

A.   **_Factual Background_**

1.   On May 5, 2009, Plaintiff was arrested for Trafficking and Conspiracy to Traffic a Controlled Substance.   Criminal Docket Sheet for *State v. Craig Ellis*, D-202-CR-200902131 [Doc. 73-3]; *see also* NMCD Offender Information, Offender Detail [Doc. 73-4]).

2.   On May 30, 2009, Plaintiff was transferred to Bernalillo County Metropolitan Detention Center ("BCMDC") and underwent a health assessment intake.   Plaintiff's Medical Records [Doc. 73-5] at 1–2.   At the time of his incarceration and health assessment, medical care within BCMDC was provided by Correctional Medical Services ("CMS"). *Id.*

3.   Plaintiff reported no current health problems during the intake assessment. *Id.*   Plaintiff reported a history of having been treated for tuberculosis. *Id.* at 2.

4.   On June 1, 2009, Plaintiff was seen for allergies and a "scratchy" throat. *Id.* at 3–4. Plaintiff was prescribed Chlorphen. *Id.* at 5–6.

5.   On July 2, 2009, Plaintiff submitted a Health Service Request Form ("medical request") for allergies and was seen and prescribed further allergies medication the next day. *Id.* at 7.

6.   On July 6, 2009, Plaintiff submitted a medical request for pain medication and an x-ray of his side. *Id.* at 8.   He was seen by the triage nurse the following day. *Id.*

7.  On July 8, 2009, Plaintiff submitted a medical request for a sore throat. *Id*. at 9.

8.  Also on July 8, 2009, Plaintiff received a second evaluation for his side pain. *Id*. at 10−11. He explained that he had been in a fight two weeks prior. *Id*. at 10. An x-ray was taken and came back negative. *Id*. at 11.  Plaintiff was prescribed ibuprofen.  *Id*.

9.  On July 10, 2009, Plaintiff filed Grievance No. 016986, claiming that he was not being seen for his medical requests and was not being provided medication. Plaintiff's Grievance File [Doc. 73-20] at 11–13. Plaintiff's grievance was found resolved and appropriately treated. *Id*. at 11.  Plaintiff did not appeal the decision.  *Id*.

10. On July 13 and 14, 2009, Plaintiff submitted medical requests for allergies and allergy medication. [Doc. 73-5] at 12–13. Plaintiff was uncooperative when he was seen. *Id*. at 13.

11. On July 20, 2009, Plaintiff submitted a medical request for allergy headaches. *Id*. at 14. Plaintiff was seen that day and prescribed Chlorphen and Excedrin. *Id*. at 15–16.

12. On July 22, 2009, Plaintiff submitted a medical request for allergy headaches and medication. *Id*. at 17.  Plaintiff was prescribed acetaminophen.  *Id*. at 18.

13. On July 30, 2009, Plaintiff was seen for allergies.  *Id*. at 19–20.

14. On August 3, 2009, Plaintiff submitted a medical request. *Id*. at 21. When Plaintiff was seen, he stated "I'm ok." *Id*.

15. On August 26, 2009, Plaintiff submitted a medical request because he ran out of allergy medication. [Doc. 73-6] at 1. Plaintiff's medication was re-filled and he was educated on the frequency for taking his medication.  *Id*. at 1–2.

16. On September 7, 2009, Plaintiff submitted a medical request because he ran out of allergy medication. *Id.* at 3. Plaintiff was educated on the frequency for taking his allergy medication. *Id.* at 3–5.

17. On October 16, 2009, Plaintiff submitted a medical request for migraine headaches. *Id.* at 6. Plaintiff was treated and prescribed ibuprofen. *Id.* at 6–8.

18. On October 17, 2009, Plaintiff's medication for depression, Zoloft (Sertraline), was renewed. *Id.* at 9. Plaintiff was also started on an additional medication to further treat his depression, Elavil (Amitriptyline). *Id.*

19. On October 26, 2009, Plaintiff submitted a medical request for allergies and hemorrhoids and was treated the same day. *Id.* at 10–12.

20. On October 26, 2009, Plaintiff submitted a second medical request stating his medication was causing him to "hear[] things." *Id.* at 13. Plaintiff was seen and referred to another medical provider. *Id.*

21. On October 29, 2009, Plaintiff submitted a medical request for allergies. *Id.* at 14. Plaintiff was seen the following day and prescribed Chlorphen and Excedrin. *Id.* at 15−16.

22. On November 9, 2009, Plaintiff submitted a medical request for heartburn and was treated. *Id.* at 17. Plaintiff submitted a second medical request for allergy headaches and stool softener, which was also addressed. [Doc. 73-7] at 1.

23. On November 18, 2009, Plaintiff slipped and fell. *Id.* at 2. He presented at the clinic with complaints of left ring finger pain and swelling in his right knee. *Id*. at 2–3. Plaintiff was examined, prescribed Naproxen, and told to return the next day or as needed. *Id.*

24. On November 19, 2009, Plaintiff submitted a medical request seeking an x-ray of his left ring finger and right knee. *Id.* at 5. Plaintiff was seen, x-rays were ordered, and his depression medication was renewed. *Id.* at 4–8.

25. On November 20, 2009, Plaintiff filed Grievance No. 017281, claiming that he did not get an x- ray of his left hand and right knee. [Doc. 73-20] at 3–5. The Grievance response was that he did receive x-rays and they were negative. *Id.* at 3.

26. On November 23, 2009, Plaintiff reported his x-rays came back negative. [Doc. 73-7] at 9. Plaintiff reported his knee gave out on him. *Id.* He was re-assessed, his x-rays were reviewed, and he was instructed to continue on Naproxen.  *Id.*

27. Also on November 23, 2009, Plaintiff submitted a medical request for headaches from allergies, constipation, and heartburn. *Id.* at 10. Plaintiff was treated the following day. *Id.* at 10, 14–17.

28. On November 24, 2009, Plaintiff submitted a medical request asking to be taken to the hospital for an MRI of his right knee. *Id.* at 11. Plaintiff was seen the same day for both his right knee and left hand. *Id.* at 11–13. No change was noted from the previous day's examination; Plaintiff was scheduled for follow-up appointment on December 2, 2009, and was reminded to continue taking Naproxen.  *Id.* at 11–12.

29. On November 25, 2009, Plaintiff's seasonal allergy medication was renewed. *Id.* at 18.

30. On November 25, 2009, Plaintiff filed Grievance No. 017306, claiming that he was not being treated for allergies, hemorrhoids, and heartburn, and that he had not received an MRI of his left hand and right knee. [Doc. 73-20] at 8. The Grievance response was that Plaintiff would be assessed in one week by a physician.  *Id.*

31. On November 26, 2009, Plaintiff submitted a medical request for an MRI of his right knee to be taken at Presbyterian Hospital, and for heartburn, allergies, headaches and hemorrhoids. [Doc. 73-7] at 19. Plaintiff was seen the following day. *Id.* Plaintiff refused a fiber supplement and had already been prescribed allergy medication and pain medication. *Id.*

32. On November 30, 2009, Plaintiff submitted a medical request to be taken to the hospital for an MRI, heartburn, hemorrhoids, left ring finger pain and right knee pain. *Id.* at 20−22. Plaintiff was seen on December 1, 2009. *Id.* A second set of x-rays were ordered for Plaintiff's right knee and left hand, and a test was ordered for Helicobacter pylori (HP") infection. *Id.* at 23.

33. On December 2, 2009, Plaintiff submitted a medical request for x-rays of his right knee and left hand. *Id.* at 24. Plaintiff was seen the following day and a basic metabolic panel, Hepatitis A, Hepatitis C, Hemoglobin and Hematocrit, HP tests were all ordered. *Id.* at 24; [Doc. 73-8] at 1−2. Parafon Forte (Chlorzoxazone), a large knee brace, and a lower bed bunk pass were ordered, in addition to the previous Naproxen. *Id.*

34. On December 7, 2009, Plaintiff submitted a medical request for an MRI on his left ring finger and right knee and complained of pain. [Doc. 73-8] at 3. Plaintiff was seen and treated the same day. *Id.* at 3−5. Plaintiff was in possession of allergy medication. *Id.*

35. Later on December 7, 2009, Plaintiff submitted a second medical request for an MRI of his left ring finger and right knee, and requested allergy medication. *Id.* at 6. Plaintiff was seen the following day and provided additional allergy medication. *Id.* at 7−8.

36. On December 10, 2009, Plaintiff submitted a medical request stating he wanted to go to the hospital due to pain from his November 18, 2009 fall. *Id.* at 9. Plaintiff was seen the same day, assessed and provided acetaminophen for additional pain relief. *Id.* at 10–11.

37. On December 11, 2009, Plaintiff appealed Grievance No. 017306, claiming that he wanted an MRI of his left hand and right knee. [Doc. 73-20] at 6. The Appeal response was that a physician would make the determination regarding a referral. *Id.*

38. On December 14, 2009, Plaintiff submitted a medical request stating he wanted to see an orthopedic surgeon and have them examine his left ring finger and right knee. [Doc. 73-8] at 12.  He was evaluated the same day. *Id.*

39. On December 15, 2009, Plaintiff submitted a medical request stating he did not get his blood pressure checked, and requesting vitamins. *Id.* at 13. Plaintiff was seen the following day for his blood pressure check, vitamins request and other ailments. *Id.* at 13–18. He was prescribed Darvocet (acetaminophen and propoxyphene) for pain, Zantac for heartburn, and his depression medications were renewed. *Id.* at 17.

40. On December 18, 2009, Plaintiff submitted a medical request asking that he be tested for diabetes. *Id.* at 19.

41. Also on December 18, 2009, Plaintiff submitted a medical request stating he was not getting chicken, turkey or roast beef at his meals and instead, cold cuts and hamburger meat, which constipated him and that the food was not fit for human consumption per the container the food arrived in. *Id.* at 20.

42. Plaintiff was seen for his two December 18, 2009 medical requests the same day. *Id.* at 21–22.

43. Also on December 18, 2009, Plaintiff appealed Grievance No. 017281 regarding whether or not he had received x-rays. [Doc. 73-20] at 1. The Appeal response was that he had received x-rays, and they were negative. *Id*.

44. On December 21, 2009, Plaintiff submitted a medical request to see a doctor for his left ring finger and right knee. [Doc. 73-8] at 23.

45. Also on December 21, 2009, Plaintiff submitted a medical request stating he was not getting chicken, turkey or roast beef at his meals and instead other meats, which he had trouble digesting, and that the food he was being served was not fit for human consumption per the container the food arrived in. *Id.* at 24.

46. Plaintiff was seen the following day for his two December 21, 2009 medical requests. [Doc. 73-9] at 1–2.

47. On December 23, 2012, Plaintiff submitted a medical request for a cold and headaches. *Id.* at 3. Plaintiff was treated the following day. *Id*. at 4–5.

48. Plaintiff's HP test returned positive on December 23, 2009. *Id.* at 7. Plaintiff was treated with Tetracycline and his medications were renewed and updated. *Id*.

49. On December 27, 2009, an order was placed for Plaintiff to have regular blood pressure checks. *Id.* at 2.

50. On December 27, 2009, Plaintiff submitted a medical request for blood pressure checks, headaches and nose bleeds. *Id.* at 6. Plaintiff was seen the following day. *Id*.

51. On January 12, 2010, Plaintiff's medications were renewed including Tetracycline for HP. *Id.* at 8.

52. On January 19, 2010, Plaintiff submitted a medical request seeking a "diet tray" for lunch because the meats he was receiving with lunch were giving him headaches and chest pains. *Id.* at 9. Plaintiff was seen the same day for his meal request. *Id.* at 10–11.

53. On January 26, 2010, Plaintiff submitted a medical request for the results of his x-rays and to be referred to an orthopedic surgeon for his left ring finger and right knee. *Id.* at 12. Plaintiff was seen the following day, was reassessed and his condition remained unchanged. *Id.* at 12–13.

54. On February 3, 2010, Plaintiff was examined, his pain medication was modified and he was prescribed further medication for HP. *Id.* at 14–15.

55. On March 11, 2010, medical staff noted two incidents of Plaintiff being non-compliant with his depression medication. *Id.* at 16.

56. On March 18, 2010, Plaintiff submitted a medical request for allergies. *Id.* at 17. Plaintiff was seen the following day and prescribed more allergy medication and acetaminophen. *Id.* at 18–19.

57. On March 23, 2010, Plaintiff submitted a medical request for allergies and allergy medication. *Id.* at 20. Plaintiff was seen the following day and prescribed Chlorphen for allergies and Zantac for heartburn. *Id.* at 20–21.

58. On March 29, 2010, Plaintiff was seen and treated for hemorrhoids. *Id.* at 22–23.

59. On March 31, 2010, Plaintiff's depression medication was renewed. [Doc. 73-10] at 1.

60. On April 7, 2010, Plaintiff submitted a medical request for elbow pain, headaches and indigestion. *Id.* at 2. Plaintiff was seen on April 9, 2010, was examined and treated with antacids and acetaminophen. *Id.* at 3–6.

61. On April 12, 2010, Plaintiff's high cholesterol medication Lopid (Gemfibrozil) was renewed and lipid testing was ordered. *Id.* at 7.

62. On April 18, 2010, Plaintiff submitted a medical request for heartburn and was treated the following day. *Id.* at 8–11. Plaintiff received more Zantac and an HP lab was ordered. *Id.* at 11.

63. On May 3, 2010, Plaintiff was seen in the Chronic Disease Clinic as a follow-up on his chronic health concerns. *Id.* at 12–13. Plaintiff's medications were adjusted, given his concerns and feedback. *Id.*

64. On May 5, 2010, blood tests were performed. *Id.* at 14.

65. On June 18, 2010, Plaintiff's depression medication was renewed. *Id.* at 15.

66. On June 21, 2010, Plaintiff underwent an annual physical. *Id.* at 16, 18. Plaintiff's x-rays were discussed, and the results were negative; Plaintiff had blood testing scheduled for lipid count. *Id.* at 16–18. Plaintiff's medications were updated and, despite refusing to receive prior treatment for HP, he stated that he wanted to continue it again. *Id.* at 16.

67. On July 1, 2010, Correctional Healthcare Management ("CHM") took over medical services at BCMDC and began providing treatment and medications to the Plaintiff during his incarceration. *See* [Docs. 73-11 to 73-19]; *see also* Affidavit of William Shannon, M.D. [Doc. 73-22] at 2, Affidavit of Timothy McMurray, M.D. [Doc. 73-23] at 2, and Affidavit of Timothy Trapp, M.D. [Doc. 73-24].

68. On July 7, 2010, Plaintiff filed grievance No. 010885, stating that he was out of allergy medication. [Doc. 73-20] at 14. Plaintiff was then provided an additional supply of allergy medication. *Id.*

69. On July 14, 2010, Plaintiff complained of pain in his chest but was alert, oriented, and appeared to be in no distress. [Doc. 73-13] at 3. Plaintiff then underwent an EKG, he given Tums, additional medication, and was returned to medical care. *Id*. at 3, 14; [Doc. 73-14] at 19.

70. On July 21, 2010, Plaintiff had blood drawn. The report concerning this blood test was issued on July 25, 2010.  [Doc. 73-13] at 13.

71. On July 24, 2010, Plaintiff reported that he thought he had been given the wrong prescriptions and his head was "stinging." *Id.* at 2. He was examined and referred to follow-up care because he was in a stable condition with no swelling or hives. *Id.* His chart was examined and the orders regarding medication were clarified with the Plaintiff. [Doc. 73-14] at 17.

72. On July 27, 2010, Plaintiff filed Grievance No. 017365, claiming that he was not receiving the correct amount of medication. [Doc. 73-20] at 17. However, Plaintiff noted that the grievance was resolved because the medication that he was receiving for HP was limited to every two weeks.  *Id.*

73. On August 12, 2010, Plaintiff submitted a medical request for heart burn and allergy medication. [Doc. 73-12] at 24. Plaintiff's medications were renewed and there were no further complaints at that time. *Id*.

74. On August 13, 2010, Plaintiff submitted Grievance No. 066268 and a Grievance Appeal Form because he wanted medical to recheck for HP. [Doc. 73-20] at 19–23. Plaintiff, however, was being treated for HP at that time and was still taking medication to treat that condition. *Id*.

75. On August 19, 2010, Plaintiff complained that he had not been seen by a provider for allergies and heart burn, and requested medication. [Doc. 73-12] at 23. Plaintiff then refused sick call and stated that he had no other complaints. *Id.*

76. On August 25, 2010, Plaintiff sought medical attention for heartburn and allergies. *Id.* at 21. He was seen the next day. He requested to be referred to a provider, and stated that he did not want to continue taking allergy medicine. *Id.*; [Doc. 73-14] at 14.

77. Also on August 26, 2010, Plaintiff requested medical attention for heartburn and noted that he has "no further complaints at this time." [Doc. 73-12] at 22. Plaintiff was prescribed medications for heartburn and allergies, and was instructed to follow up if his symptoms did not improve. *Id.*

78. On August 30, 2010, Plaintiff was seen by a provider in response to his requests. [Doc. 73-12] at 20. Plaintiff complained of gastroesophageal reflux ("GERD") and allergies. *Id.* He stated that Claritin was not working for his allergies and that he was concerned about his blood pressure. *Id.* Plaintiff was then prescribed a change in diet, Claritin was discontinued, Plaintiff's blood pressure was taken, and he was scheduled for a follow-up appointment. [Doc. 73-14] at 13.

79. On September 2, 2010, Plaintiff filed Grievance No. 016757 because he was charged for medication, his allergy medication was discontinued, and his blood pressure had not been taken. [Doc. 73-20] at 24–28. The prescribed medicine was, however, appropriately charged, Plaintiff's allergy medicine was discontinued because the Plaintiff reported that it was "not working," and his blood pressure was taken. *Id.*

80. On September 3, 2010, Plaintiff had blood drawn. The report was issued on September 4, 2010. [Doc. 73-13] at 12.

81. On September 8, 2010, Plaintiff filed Grievance No. 016762, claiming that he had not received his medication. [Doc. 73-21] at 1. Plaintiff's medication was ordered and provided to the Plaintiff. *Id.*

82. On September 30, 2010, Plaintiff submitted a medical care request, complaining of a headache and pain in his abdomen which he believed was due to a reoccurrence of HP. [Doc. 73-12] at 19. He was seen and treated for his allergies and was scheduled to have a consult with the medical provider. *Id.* at 19–20.

83. On October 1, 2010, Plaintiff filed Grievance No. 011027 because he did not receive allergy medicine and was not seen as requested. [Doc. 73-21] at 4. The grievance was resolved because Plaintiff had been previously prescribed Claritin on August 26, 2010, and given medication on August 30, 2010, and October 5, 2010. *Id.*

84. On October 13, 2010, Plaintiff submitted a medical request stating that he had pain in his finger, moving to his thumb and radiating up his arm. [Doc. 73-12] at 17. He was seen that day. It was noted that the Plaintiff "thinks he needs [prescriptions] to correct the problem." He was referred to a provider for examination. *Id.*

85. On October 18, 2010, Plaintiff was seen for his left hand pain. An x-ray of his left hand taken. He was provided a brace for the hand. He also received an order for a change in diet. *Id.* at [Doc. 73-14] at 8–9. Blood work was done and he was prescribed numerous related medications to treat his complaints. *Id.* at 8.

86. On October 27, 2010, Plaintiff filed Grievance No. 011084, claiming that he had not received the special diet that had been ordered. [Doc. 73-21] at 7. The diet was prescribed and the issue was addressed to BCMDC. *Id.*

87. On November 4, 2010, Plaintiff submitted a medical request stating that he had not received the change in diet from BCMDC and requested to be treated again for HP. [Doc. 73-12] at 14. Plaintiff's chart was reviewed for follow-up treatment because the medical treatment was allegedly not effective. *Id.* On November 15, 2010, Plaintiff was then seen for chronic nausea, he was prescribed medications for his nausea, he was provided medication for GERD, and a follow-up appointment was scheduled. [Doc. 73-14] at 10.

88. On December 2, 2010, Plaintiff reported chest pain around both of his nipples when sleeping or washing and a burning sensation around his nipples once a week. [Doc. 73-12] at 12. Plaintiff was evaluated. The color of his nipples was normal with no inflammation. *Id.* The Plaintiff was prescribed ibuprofen as a trial and, if the condition worsened, the Plaintiff was reminded to contact medical. *Id.*

89. On December 9, 2010, Plaintiff stated that he had pain in his nipples and that he believed lumps were growing on his chest. *Id.* at 11. Plaintiff was then scheduled for an appointment for further evaluation. *Id.*

90. On December 14, 2010, Plaintiff complained of a lump on each side, pain in his chest, and blood coming from his nose when he blows his nose. *Id.* at 9. Plaintiff was examined about these concerns and then referred to wound care. *Id.*

91. On December 15, 2010, Plaintiff submitted Grievance No. 030692 because he never received his diet that was prescribed in October. [Doc. 73-21] at 9–14. It was noted that a special diet was ordered and the Plaintiff was to be reevaluated to determine his special dietary needs. *Id*. at 10.

92. On December 17, 2010, Plaintiff was examined for cracked heels and the lumps on his chest. [Doc. 73-12] at 2, 5, 8. Plaintiff was provided antibiotic ointment for his heels and referred to wound care. *Id.* at 2.

93. On December 21, 2010, Plaintiff submitted another medical request for the dry and cracked skin on his feet and for a secondary complaint concerning lumps around his nipples. *Id.* at 4. Plaintiff's chart was reviewed and it was noted that he was already referred for treatment on December 20, 2010. *Id.*

94. On December 22, 2010, Plaintiff's cracked skin was examined. He was treated by washing his feet and applying ointment until his condition was resolved on January 14, 2011. [Doc. 73-11] at 23–24; [Doc. 73-12] at 1.

95. On December 25, 2010, Plaintiff requested medical attention for lumps on his chest. He was scheduled for an appointment to review these complaints. [Doc. 73-11] at 22.

96. On December 27, 2010, Plaintiff submitted another medical request for headaches, pain in his chest, as well as vomiting, and it was noted that there was already a pending appointment to see a provider. *Id.* at 21.

97. On January 2, 2011, Plaintiff submitted a medical request for a sore throat. *Id.* at 16.

98. On January 5, 2011, Plaintiff requested to see a provider for lumps that were in and around his nipples. He was informed that he already had a clinic appointment scheduled. [Doc. 73-12] at 3.

99. At the clinical appointment, on or about January 10, 2011, Dr. Trapp examined the lumps on Plaintiff's chest. He determined that it was mild gynecomastia, and scheduled a follow-up appointment. [Doc. 73-19] at 17.  Plaintiff's GERD was also assessed and heartburn and allergy medicine was continued.  *Id*.

100. On January 17, Plaintiff renewed his requested to be seen by medical for a sore throat and headaches. He was offered medical care for these conditions on January 18, 2011. [Doc. 73-11] at 20. Plaintiff was prescribed medication for the headaches and was instructed to take the medication seven days a week. *Id.* at 19.

101. On January 21 and 23, 2011, Plaintiff submitted medical requests concerning his sore throat. He was examined by medical personnel on January 24, 2011. *Id.* at 17–18.

102.  On January 25, 2011, Plaintiff submitted a medical request stating that he had been treated for the lumps around his nipples but wanted to ensure that they were "nothing serious" because they appeared to be getting larger and more painful. *Id.* at 15. Plaintiff was examined and referred for a clinic appointment as he requested.  *Id*.

103.  On January 29, 2011, Plaintiff submitted two medical requests for a sore throat and for headaches. *Id.* at 12–13. Plaintiff was prescribed ibuprofen—because the Plaintiff stated Tylenol was ineffective for his pain—and additional medications for his sore throat. *Id.*

104.  On January 31, 2011, Plaintiff stated that he was seen by Dr. Trapp regarding these lumps approximately one month earlier and that he felt the lumps were getting larger and

more painful. *Id.* at 14. Plaintiff was assessed and it was determined that the Plaintiff was to have a follow-up appointment in six months to reevaluate the lump size. *Id.*

105.  On February 8, 2011, Plaintiff complained of a sore on his left leg and a cold. *Id.* at 10. Plaintiff's cold was evaluated and he was provided treatment for the sore on his leg. *Id.*; [Doc. 73-14] at 1.

106.  On February 10, 2011, Plaintiff submitted a medical care request for heartburn that he believed was related to the HP infection. He also requested that he receive his prescribed diet. [Doc. 73-11] at 9. Plaintiff's chart was reviewed and he was prescribed Prilosec and Mylanta.  *Id.*

107.  On February 13, 2011, Plaintiff placed two sick calls for the same issues. He requested a clinic visit, an MRI for his hand, another examination concerning his alleged stomach infection, and a reexamination of the lumps on his nipples. *Id.* at 7–8.

108.  Because he had not been seen by February 14, 2010, Plaintiff submitted another medical care request. *Id.* at 6.

109.  On February 15, 2011, Plaintiff was examined. *Id.* at 7–8. There were no issues noted concerning the lumps on his nipples. No deformity or swelling of the left-hand was noted. Plaintiff was already taking medication for his stomach. *Id.* at 8. Despite these facts and the fact that "all issues have been addressed in previous sick call[s]," a clinic referral was made. *Id.*

110.  On February 15, 2011, Plaintiff also filed Grievance No. 066361, claiming that he had never received the diet prescribed in October of 2010. [Doc. 73-21] at 15. Plaintiff was then prescribed new dietary restrictions and the diet was ordered for the Plaintiff. *Id.*

111.  On February 17, 2011, Plaintiff stated that his allergy medicine was not working and requested an increase in dosage of Benadryl for his allergies. [Doc. 73-11] at 5. Plaintiff's dosage was increased as requested. *Id.*; [Doc. 73-13] at 21.

112.  On February 24, 2011, Plaintiff was seen at the clinic, complaining of bumps on his penis. [Doc. 73-11] at 3–4. His condition was assessed but no mention was made concerning his left hand or alleged HP infection.  *Id.*

113.  On February 25, 2011, Plaintiff submitted a medical request stating that his medical needs needed to be reevaluated to determine an appropriate diet for the possible HP infection. *Id.* at 2. Plaintiff was assigned a bland diet. He asked to be retreated for HP, although he had not completed the prior treatment. *Id.* Plaintiff's diet was ordered and he was prescribed additional medication to treat the complaint. [Doc. 73-13] at 20.

114.  On March 6, 2011, Plaintiff's stomach problems were assessed. No weight loss was reported, but he was noted to be "anxious and dramatic about [his] health issues." [Doc. 73-11] at 1. Plaintiff's lab results and medications were discussed, and he was assigned yet another diet. *Id.*; [Doc. 73-13] at 18–19; [Doc. 73-21] at 15.

115.  On March 16, 2011, Plaintiff was released from custody of BCMDC. No medical care was provided by Defendants after that date.

### B.    *Eighth Amendment Claim*

#### 1.    Legal Standard

"A prison official violates an inmate's clearly established Eighth Amendment rights if he acts with deliberate indifference to an inmate's serious medical needs—if he knows of and disregards an excessive risk to inmate health or safety." *Garrett v. Stratman*, 254 F.3d 946, 949

(10th Cir. 2001) (internal quotation marks omitted). Stated differently, prison officials violate the Eighth Amendment's ban on cruel and unusual punishment if their deliberate indifference to serious medical needs of a prisoner constitutes unnecessary and wanton infliction of pain. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must show that he suffered harm sufficiently serious to implicate the cruel and unusual punishment clause. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (citing *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006), *rev'd on other grounds by Robbins v. Okla.*, 519 F.3d 1242 (10th Cir. 2008)). In evaluating an Eighth Amendment claim, the court conducts a two-pronged inquiry, composed of an objective and subjective component. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the objective inquiry, the "alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self*, 439 F.3d at 1230 (citing *Farmer*, 511 U.S. at 834). Under the subjective inquiry, "the prison official must have a 'sufficiently culpable state of mind.'" *Id.* at 1230–31 (citing *Farmer*, 511 U.S. at 834).

The Court of Appeals for the Tenth Circuit further explained:

> The two-pronged *Estelle* standard "requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious." A medical need is serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment.

*Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (internal citations omitted).

However, the Tenth Circuit makes clear that the "accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment." *Id.* (citing *Estelle*, 429 U.S. 105–06). "*A fortiori*, a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment." *Id.*

Moreover, it is important to note that an inmate's belief that he should have received different or better treatment is not, by itself, evidence of an Eighth Amendment violation or of deliberate indifference to serious medical needs. *See Green v. Branson*, 108 F.3d 1296, 1304 (10th Cir. 1997) ("We are persuaded that a showing of deliberate refusal to provide medical attention, ***as opposed to a particular course of treatment***, coupled with falsification of medical records may give rise to an Eighth Amendment violation and is cognizable under 42 U.S.C. § 1983." (emphasis added)); *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) ("[A] prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment."). The fact that an inmate may prefer or believe that another course of treatment is better or warranted is not evidence of a constitutional violation. *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) ("[A]] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation.").

2.   **Application**

It is questionable whether Plaintiff's complaints are sufficiently serious to satisfy the objective prong of the *Estelle v. Gamble* test.  But even if Plaintiff is given the benefit of the doubt on that issue, based on the extensive medical care and treatment he received, there is no evidence to demonstrate that Defendants were deliberately indifferent to Plaintiff's health. Defendants did not fail to treat Plaintiff, nor did they prevent him from receiving medical treatment. Indeed, he was seen at least ten times during the two weeks following his slip and fall. He received diagnostic imaging and pain medication after his fall. He was initially prescribed Naproxen, and when that failed to relieve his pain, alternative medications were tried. When his complaints persisted, X-rays were ordered. Plaintiff argues that Defendants should have ordered an MRI when the X-rays came back negative. However, failure to order a specific diagnostic test does not rise to the level of cruel and unusual punishment. *Estelle*, 429 U.S. at 107 (failure to provide an x-ray to diagnose Plaintiff's back pain did not demonstrate culpable mental state because the decision whether to order diagnostic test "is a classic example of a matter for medical judgment").

Likewise, Plaintiff's argument that Defendants refused to send him to see a specialist cannot support an Eighth Amendment claim. *Franklin v. Kansas Dept. of Corr.*, No. 05-3166, 160 Fed. App'x 730, 735 (10th Cir. Dec. 23, 2005) (unpublished) (the decision to consult a specialist "is generally considered an exercise of medical judgment that is not subject to redress under the Eighth Amendment").

This case boils down to a situation where Plaintiff disagrees with the particular course of treatment chosen by his medical care providers. However, Plaintiff's belief that he should have

received different and better medical treatment is not, by itself, evidence of an Eighth Amendment violation or of deliberate indifference to serious medical needs. Defendants' refusal to provide a particular course of treatment sought by the Plaintiff does not constitute deliberate indifference. *See Perkins*, 165 F.3d at 811. Medical care providers are free to exercise their independent professional judgment. *Dulany*, 132 F.3d at 1240. Put differently, an inmate is not entitled to any particular course of treatment even if he thinks it is the preferable treatment. *Id*.

Plaintiff fails to set forth evidence sufficient to raise genuine issues of material fact with respect to whether Defendants acted with deliberate indifference to his serious medical needs. Plaintiff's medical records, attached as exhibits to the *Martinez* Report [Doc. 73], demonstrate that he received ongoing, extensive, care. *See, e.g., Albritton v. Quarterman*, Civil Action No. 6:08cv268, 2009 WL 585659, at *7 (E.D. Tex. Mar. 6, 2009) (unpublished) (noting that "medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs").

Moreover, when an Eighth Amendment claim is premised on an alleged delay in medical care, the prisoner must "show that the delay resulted in substantial harm." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotation marks omitted). The prisoner must show that the more timely receipt of medical treatment would have minimized or prevented the harm. *Kikumura*, 461 F.3d at 1292, *rev'd on other grounds by Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008). In other words, the prisoner must show a causal link between the alleged delay and the resultant harm. *Daniels v. Gilbreath*, 668 F.2d 477, 488–89 (10th Cir. 1982). Plaintiff has produced no evidence showing that the alleged deficiencies in medical care (failure

to order an MRI for his finger, and delay in treating his alleged HP infection) would have minimized or prevented the harm of which he now complains.

Thus, for the reasons set forth above, I recommend that Plaintiff's Eighth Amendment claims be denied and dismissed with prejudice.

C.    *Other Claims*:

Plaintiff attempts to set out claims under the Privileges and Immunities Clause of the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment.  *See* Complaint [Doc. 1] at 4. He offers no explanation as to how the Privileges and Immunities Clause might be applicable to his claims. I recommend, therefore, that any such claim be dismissed with prejudice.

As to Plaintiff's due process claim, it is clear that his claims are based on alleged denial of medical care. *See generally id.* As such, the Court must consider them as claims arising under the Eighth Amendment. *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (noting that when a prisoner asserts claims under the Eighth and Fourteenth Amendment due to inadequate medical care, the court should review the claims solely under the Eighth Amendment); *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against [a particular sort] of governmental conduct, . . . that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (internal quotation marks omitted)); *Estelle*, 429 U.S. at 104 (deliberate indifference to an inmate's serious medical needs constitutes "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment's prohibition against cruel and

unusual punishment). As discussed above, I recommend that all Eighth Amendment claims be dismissed with prejudice.

**IT IS THEREFORE RESPECTFULLY RECOMMENDED** that Defendants William Shannon, M.D., Timothy McMurray, M.D., and Timothy Trapp, M.D.'s *Martinez* Report [Doc. 73] be treated as a motion for summary judgment, that the motion be **GRANTED**, and that this action be **DISMISSED WITH PREJUDICE**.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any written objections with the Clerk of the District Court within the 14-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____

**STEPHAN M. VIDMAR**
**United States Magistrate Judge**